ARTHUR HOLST, APPELLEE, v. HULDA J. WARNER, APPELLANT.

FILED NOVEMBER 28, 1927. NO. 24484.

*John W. Yeager,* for appellant.

*Hainer, Flansburg & Lee* and *Peterson & Barta, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

GOOD, J.

Plaintiff brought this action against his mother-in-law, to recover damages for the alienation of his wife's affections. In a general way he alleged that the acts and conduct of defendant were wilful and malicious and such as to, in fact, alienate the affections of his wife. In her answer defendant admitted the relationship of the parties; denied that she had alienated the affections of plaintiff's wife or done any act calculated to bring about that result; and alleged that the affections of plaintiff's wife were alienated by his own misconduct; that plaintiff had no affection for his wife, and for that reason she had lost her affection for him; that plaintiff had made use of his marital relationship to obtain money and property from defendant, who was in comfortable circumstances; that plaintiff did not properly support his wife; that defendant had done all that she could to make the married life of plaintiff and his wife happy. The reply was in the nature of a general denial. A trial of the issues resulted in a verdict and judgment thereon

for plaintiff in the sum of $5,000. Defendant has appealed.

This cause has been heretofore submitted to and an opinion prepared by the supreme court commission reversing the judgment of the district court, and is now before us upon a motion for rehearing.

The assignments of error are numerous and may be summarized as follows: That the court erred in refusing to give instructions Nos. 1 and 2, requested by defendant; erred in giving instructions Nos. 5, 7 and 8, given by the court on its own motion; that the court erred in not directing a verdict for defendant; that the verdict is not supported by the evidence and is excessive.

The instructions requested by defendant and refused by the court related to the right of defendant to give parental advice to her daughter and would have informed the jury that, if defendant did give such advice without malice and with intent to benefit her daughter, plaintiff could not recover, even though such advice resulted in the separation of plaintiff and his wife.

From an examination of the answer, it is apparent that parental advice, given in good faith, was neither pleaded nor relied upon as a defense, and in her testimony defendant categorically denied giving any advice to her daughter, or that she counseled her in any way with reference to a separation from her husband. The instructions, therefore, were not applicable to the issues or to the evidence given by defendant. It may be observed that, although such issue was not presented by the pleadings, the court did instruct upon the question and gave the defendant the benefit of a defense which she had not pleaded, and which was not supported by her evidence.

With respect to the instructions given by the court on its own motion, the record discloses that the only assignment in the motion for a new trial, relating to that subject, is as follows: "That the court erred in giving instructions numbered 1 to 10, inclusive, of its own motion." It has long been the rule that such an assignment will be considered no further than to ascertain that any one of the instructions

was properly given. *Hiatt v. Kinkaid*, 40 Neb. 178; *Mc-Donald v. Bowman*, 40 Neb. 269; *Armann v. Buel*, 40 Neb. 803; *Mattern v. McCarthy*, 73 Neb. 228. We have carefully examined the entire charge, given by the court to the jury, and find no error in any of the instructions, save, possibly, one, wherein it gave to the defendant the benefit of a defense which she did not plead. Of course, defendant cannot predicate error upon the giving of an instruction more favorable to her than she was entitled to under the law. It follows that this assignment of error is not well taken.

The next two assignments may be treated together. It is not practicable to outline all of the great volume of evidence in this case. We will, therefore, summarize some of the more important parts, as disclosed by the record.

Plaintiff and defendant both resided in the village of Wausa, Nebraska, and their residences were in close proximity to each other. Plaintiff and his father, as copartners, were engaged in the hardware business. For a little more than a year after the marriage of plaintiff and defendant's daughter, the young couple appeared to live happily together. They went frequently to places of entertainment, to parties, social functions, moving picture shows, picnics, and, in turn, entertained their friends at their home. Many of the immediate neighbors and friends of plaintiff and his wife were called as witnesses, and they testified to the happy relationship existing between plaintiff and his wife.

It appears that something like 14 months after the marriage some feeling arose between plaintiff and his mother-in-law. She came to his home one Sunday morning, according to his testimony, and there upbraided him in the presence of his wife, charging that he had not been properly attentive to his wife; that he did not take her to places of entertainment and amusement and did not treat her as a husband should treat his wife; that he then informed her that he thought they were getting along very well and would get along better if there was no intermeddling. Plaintiff's testimony tends to show that the defend-

ant immediately departed, slamming the door as she went out. On the following day, when plaintiff came home from the store in the evening, his wife was not at home. He searched about the house and premises and did not find her. He went to the home of defendant and inquired if his wife were there, and defendant informed him that she was not and that she did not know where his wife was. A little later plaintiff learned that his wife was and had been at the home of the defendant all the time. He visited with her there and finally, some 10 days later, secured her consent to return to his home. Plaintiff's testimony tends to show that, at the time, defendant stated that, if her daughter went home to her husband, she would do so against defendant's wish and without her consent. Plaintiff's wife did return to him and they lived together for several months thereafter.

It also appears from the record that some months after the marriage plaintiff borrowed from defendant $600 and evidenced the loan by his promissory note, payable to her and bearing 10 per cent. interest from its date. On one occasion, a little more than two years after the marriage, defendant called at plaintiff's place of business, when a number of customers were in the store, and there she again upbraided him, in the presence of others, for not properly treating his wife and for not taking her to places of amusement and entertainment, and told him that she would not stand such treatment from him or anyone like him, and demanded payment of his note. Defendant's testimony tends to show that at the time all she was asking was for the interest. Plaintiff's testimony shows that, at that time, the interest and one-fourth of the principal had been paid. A short time later the remainder of the principal was paid. On the above occasion, as defendant was leaving the store, the evidence tends to show, she remarked, in substance: "You'd better do what I tell you or you will lose your happy home." Plaintiff's testimony tends to show that, for some months prior to the final separation of plaintiff and his wife, defendant would not speak to him when she met him; did not go to

his home when he was there, but frequently visited his home when he was at his place of business; and that, as he would be returning to his home, he would observe the defendant leaving by a side or back door, going across the yard to her own home; that on such occasions he would find his wife silent and moody, which would be her mood only after her mother's visits; that, when he inquired the cause, she would state that there was no trouble.

The evidence further shows that a few weeks later plaintiff's wife commenced an action for divorce; that defendant and her daughter went together to the county seat to consult a lawyer, following which the action was instituted; that for a week or two prior to the commencement of the divorce action, without plaintiff's knowledge, his household goods and furnishings were moved from plaintiff's home to the home of defendant; that defendant participated in such removal and helped to carry away the household goods. The evidence tends to show that defendant employed men to help carry the furniture from plaintiff's to her home, and actively assisted in such removal; that the action for divorce was tried, and the evidence also shows that plaintiff and his wife are still undivorced, from which it must be inferred that the trial of the divorce action resulted favorably to the husband, plaintiff in this action.

While being cross-examined as a witness, defendant gave the following testimony: "Q. You remember the time you were in the store and asked Arthur (plaintiff) for the payment of this note, do you? A. I do. Q. You say that you never made a statement that, if he wasn't careful, he was going to lose his happy home? A. I didn't say that. Q. You heard his father testify to that and you heard him testify to that? A. I didn't say it. Q. What did you say when you went out of that store and passed his father? A. I didn't say anything like that. I don't know what I said. I knew it would be the breaking up of my daughter's home. Q. That is what you have been trying to do continuously? A. Yes; I have." This testimony was not qualified or explained by defendant.

It is true that the evidence upon many of the points is in hopeless conflict. It is perfectly clear from the record that for a year or more plaintiff and his wife lived together happily, without any trouble or difficulty; that they are now separated and the home broken up. Whether the home was broken up by plaintiff's misconduct, as claimed by defendant, or by defendant's misconduct, as claimed by plaintiff, was a question peculiarly for the jury. It may be further observed that in some respects the defendant's testimony was contradicted on material points by her own witnesses; also that six of her neighbors, who had known her for many years and who lived in the vicinity, were called, and they testified that her reputation in the community for truth and veracity was not good. No witness was called to sustain her reputation in this respect.

Under all the circumstances, we cannot say that the jury were not warranted in disregarding her testimony or giving it but little weight. There is sufficient competent evidence to require the submission of the case to the jury. Their finding upon a disputed question of fact is conclusive upon this court.

It is urged that the verdict is excessive, and that no witness has testified as to the amount of pecuniary damages that plaintiff has sustained by losing the affections of his wife. We think it is the rule in cases of this class that it is unnecessary, and it would be improper, for any witness to testify as to the amount of damage which plaintiff has sustained. Plaintiff and his wife were under 30 years of age. Until his marital affairs were interfered with by defendant, he had prospects of many years of happy married life. Now he and his wife are separated and estranged, and his life embittered. The amount of damages which should be awarded under the circumstances is left to the sound discretion of the jury, which they must determine from all the facts and circumstances proved. We are not warranted in saying that $5,000 is more than a fair pecuniary award for the injury which plaintiff has suffered. In a case quite

similar to the instant case, this court sustained a recovery of $10,000. *Stocker v. Stocker*, 112 Neb. 565.

No error prejudicial to defendant has been pointed out. It follows that the judgment heretofore entered in this court should be and is vacated and set aside, and the judgment of the district court is

AFFIRMED.

THOMPSON, J., dissenting.

Upon a careful consideration of the record, I am constrained to disagree with the majority opinion, as from such record I am convinced that the defendant did not exceed her lawful authority and duties as a parent in the premises, and that the verdict was one prompted by passion or prejudice.

DEAN, J., dissenting.

This dissent is respectfully submitted in the belief that the judgment of reversal rendered by the commission rightly determined the issues as between the parties. And, in respect of the merits, it fairly appears to the writer that the defendant acted nothing more than the part of a reasonably indulgent mother toward the plaintiff and his wife, and not that of a malicious, interfering, neighborhood busybody, as the plaintiff son-in-law contends. And, besides, the burden of proof was erroneously imposed on this woman defendant by at least one instruction. The fact that no children were born to this union doubtless added to the discontent and the unhappiness of the plaintiff and his wife. But the plaintiff testified that the defendant's estate was worth $150,000, "or about that sum." Was this fact the inducement for a suit for the stupendous sum of $40,000 as remunerative damages?

In *Trumbull v. Trumbull*, 71 Neb. 186, this is said:

"There is a well-defined distinction between the privileges accorded to parents and guardians in their communications with children and wards, with reference to their domestic relations, and that which exists between strangers."

The judgment from which the defendant appealed, how-

ever, appears to be a far cry from the beneficent rule announced in the *Trumbull* case.

In respect of the material facts, it is uncontradicted that, on an evening in May, 1921, the defendant mother-in-law called at the Holst home and found her daughter ill and alone and lying on the floor. She was gasping for breath and was unable to speak and her mother believed that she was dying. As soon as her daughter's physical and generally distraught condition would permit, she was removed to her mother's home, the same day, and a physician was summoned and he corroborated the defendant's material evidence in respect to her daughter's condition in every essential particular. The physician testified:

"I found her in a typical hysterical convulsion, hands clenched, muscles tense, and crying. Q. Did you treat her at that time? A. Yes, sir. Q. What treatment? A. I gave her a hypodermic of morphine. Q. Did you prescribe? A. Yes, sir." He testified that, in his opinion, her illness was caused by "family troubles—worry." He advised a rest or a change for his patient, and his advice was followed.

While yet the plaintiff's wife was lying sick and bedfast at her mother's home, where she remained almost two weeks after her illness began, her husband came to see her. But she called her brother to her bedside and told him to go and tell him that she did not then want to see him. On the cross-examination of the plaintiff, it was developed that on another occasion he called at the defendant's home during the succeeding period in which his wife was convalescing. The defendant was in the sick-room taking care of her daughter. In the course of his cross-examination, the plaintiff testified that he had a talk with the defendant in which, according to his own evidence, she said this to him:

" 'Just see the condition Ethel is in, Art, and to think you are the cause of it all.' Q. What did you say? A. I don't believe I answered Mrs. Warner on that. Q. You didn't reply to that at all? A. I don't think I did. Q. Then, you permitted her to accuse you of being the cause of her

daughter's condition without making any reply. A. I believe I did."

The plaintiff was then a mature man of affairs and about 30 years of age. And yet, by a silence which he confessed in open court, he failed to breathe so much as a word in denial of the charge that he was the cause of the nervous collapse and the subsequent serious illness of his wife. And upon an insistent and prolonged cross-examination of the defendant these facts were developed and they appear to go to the very heart of this controversy:

"Q. You like Art, don't you, Mrs. Warner? A. I never had anything against him. Q. You like him? A. Yes. Q. You would like to see him live with your daughter? A. Yes. Q. Have you done anything toward trying to reconcile them since the divorce action was brought? A. I have. Q. You have never talked to him since that time? A. He has not talked to me. Q. He meets you on the street and speaks and you don't speak to him? A. He doesn't speak to me. Q. He doesn't? A. No."

Further continuing the defendant's cross-examination, these facts were also brought out:

"Q. Did you have any talk with Arthur Holst before he went home? A. He begged me to come to the house and visit Ethel and do just as I had always been doing. * * * He said it was all his fault, he was sorry, and things would be better."

The plaintiff testified that when he went to bring his wife home the defendant said: "If you do, it is not with my consent." And the plaintiff complains of this. But what would be more natural than that a mother, in her solicitude for the welfare of a convalescent daughter, should indicate that she feared for her well-being, if not indeed for her ultimate recovery, if she should, within so short a time after so serious an illness, undertake the burdensome duties of a housewife. And in respect of the separation of the parties, and as a part of a cross-examination which doubtless appeared to the defendant to be intensely severe, she was asked: "Q. That is what you have been trying to do con-

tinuously? A. Yes, I have." This question as put to the defendant by an alert cross-examiner, and the answer, is the plaintiff's peak point of attack against this mother. In the brief, this feature is emphasized, and there presented, as an italicized introduction to the plaintiff's argument, and, from the plaintiff's insistent viewpoint, it appears to be the *ultima thule* of this legal engagement. The answer, however, appears to be so plainly at variance with the de- ·fendant's material evidence on the direct examination, and ·especially on the cross-examination, that it is only reason- .able to conclude that this mother, now no longer a young woman, and apparently unused to the publicity of a crowd- ed courtroom, was either confused at the time or she did not understand the question as put to her near the close ·of an apparently exhaustive cross-examination.

When the taking of testimony was concluded, defendant's counsel announced that he was "completely taken by sur- prise" in respect of the alleged impeaching testimony. The court thereupon stated that he was willing to continue the ·case until the next day, but concluded the offer with this statement: "However, it looks as though the whole town of Wausa is here in the courtroom. I will give you a recess of ten minutes and possibly you can find witnesses here who would willingly go on the stand in behalf of your ·client." But counsel for defendant, a nonresident of Wau- sa, and doubtless therefore unacquainted with, and un- known to, the Wausa parties who were present, could not reasonably avail himself of the court's offer and the case was closed. This unfortunate feature of the case must be dismissed with the observation that much of the defendant's material evidence was corroborated.

The instructions were objected to *en masse*, and four ·cases, or perhaps more, have been cited which hold that such an assignment will be considered no further than to ascer- tain that any one of the instructions was properly given. And the latest cited decision, in point of time, was rendered more than twenty years ago. But a better and a more salu- tary rule of practice was provided by an act of the legis-

lature that is addressed to and is binding on all courts. The act follows:

"The court, in every stage of an action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." Comp. St. 1922, sec. 8657.

This act, too seldom invoked, is a legislative protest against technical construction in the application of fundamental principles of justice and equity to the affairs of men, when life, liberty, or fortune, may be at stake in the outcome of a trial in court. By the application of just such a technical rule of practice, a party litigant, though clearly in the right, might by inadvertence or mistake or oversight of the pleader be deprived of his entire estate. It fairly appears to the writer that the trial court erred in denying a retrial.